AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
TINNO WIKO LIFE 3 SMARTPHONE, CURRENTLY LOCATED AT )
THE FBI AT 601 FOURTH STREET NW, IN WASHINGTON, D.C., )
UNDER RULE 41 )
)

Case No.  22-SW-391

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

Located in the _____ District of Columbia _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2114(a) - Armed Postal Robbery; | |
| 18 U.S.C. § 1951(a) - Interference with Interstate Commerce by Robbery. | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kevin Moore, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date:  12/16/2022 _____
*Judge's signature*

City and state:  Washington, D.C. 
Robin M. Meriweather
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>TINNO WIKO LIFE 3 SMARTPHONE, CURRENTLY LOCATED AT<br>THE FBI AT 601 FOURTH STREET NW, IN WASHINGTON, D.C.,<br>UNDER RULE 41 | )<br>)<br>)<br>)<br>)<br>) |

Case No.  22-SW-391

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of Columbia _____ .
*(identify the person or describe the property to be searched and give its location)*:

 See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

 See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ December 30, 2022 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 12/16/2022 _____

_____
*Judge's signature*

City and state: _____ Washington, D.C. _____

_____ Robin M. Meriweather _____
United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>22-SW-391 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is a Tinno Wiko Life 3 smartphone, Model Number U316AT, blue and black in color, with IMEI 860107052995539 (hereinafter, the "Device").  The Device is currently located at the Federal Bureau of Investigation's Washington Field Office, 601 Fourth Street NW, Washington, D.C. 20535.

**ATTACHMENT B**

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 1951(a) (Interference with Interstate Commerce by Robbery) and 18 U.S.C. § 2114(a) (Armed Postal Robbery) (hereinafter, the "SUBJECT OFFENSES"), as described in the search warrant affidavit, including, but not limited to call logs, phone books, photographs, voicemail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data:

a. Reflecting the ownership and use of the Device, as further described in Attachment A;

b. Establishing or documenting the commission of the SUBJECT OFFENSES;

c. Identifying locations where the suspect committed the SUBJECT OFFENSES, traveled to before and after the commission of the SUBJECT OFFENSES, and in preparation for the SUBJECT OFFENSES;

d. Documenting access to clothes or personal items used during the SUBJECT OFFENSES, including clothing, bags, bicycles, and firearms or imitation firearms, as detailed in the affidavit;

e. Reflecting communications between the suspect committing the SUBJECT OFFENSES and other individuals, discussing the commission of one or more of the SUBJECT OFFENSES;

f.  Records and information that constitute evidence of the state of mind of the suspect, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the SUBJECT OFFENSES; and

g.  evidence of who used, owned, or controlled the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF TINNO WIKO LIFE 3 SMARTPHONE, CURRENTLY LOCATED AT THE FBI AT 601 FOURTH STREET NW, IN WASHINGTON, D.C., UNDER RULE 41** | **SW No. <u>22-SW-391</u>** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Kevin Moore, a Special Agent of the Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—a digital device—which is currently in law enforcement possession (the "Device"), as further described below and in Attachment A, and the extraction from that property of electronically stored information, as described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation and have been since August 21, 2016.  I am currently assigned to the FBI's Violent Crime Task Force, which is responsible for investigating violent crimes and major offenders in Washington, D.C.  During the course of my participation in law enforcement, I have conducted arrests and executed search and seizure warrants and court orders.  I have investigated crimes involving bank robberies, Hobbs Act violations, extortion, threats, carjackings, and kidnappings.  During my tenure with the FBI, I have also worked on other types of investigations including money laundering and counterintelligence.

My training included instruction on investigative tools and criminal law, such as the development and identification of probable cause to support the execution of search warrants.

3.      I am an "[i]nvestigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7).  I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for violations of Federal law.  As an FBI Special Agent, I am authorized to execute warrants issued under the authority of the United States.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 2114(a) (Armed Postal Robbery) and 18 U.S.C. § 1951(a) (Interference with Interstate Commerce by Robbery) (collectively, the "SUBJECT OFFENSES"), have been committed by MARK THOMAS MOORE ("MOORE").  There is also probable cause to search the Device, further described below and in Attachment A, for the things described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.      The property to be searched is a Tinno Wiko Life 3 smartphone, Model Number U316AT, blue and black in color, with IMEI 860107052995539, that is, the "Device."

7.      The Device is currently located at the FBI's Washington Field Office, 601 Fourth Street NW, Washington, D.C. 20535.

## PROBABLE CAUSE

8.      Members of law enforcement within the District of Columbia have been investigating multiple armed robberies of establishments that occurred between October 21, 2022, and November 28, 2022.  Specifically, these offenses involved similarities in specific items of clothing worn by the suspect or items used during the commission of the offenses.  While investigating the offenses that occurred in relatively close geographic proximity over a similar timeframe, law enforcement identified Mark Thomas MOORE as a suspect as a result of a latent fingerprint match from the cash drawer insert divider of the U.S. Post Office robbed on November 22, 2022.

9.      During the course of investigating the offenses described below, MOORE was arrested on November 28, 2022, shortly after he robbed a CVS located in Arlington, Virginia.  Law enforcement subsequently obtained authorization to search two residences connected to MOORE.  Law enforcement recovered numerous items of clothing and personal effects that can be seen in the surveillance footage from the SUBJECT OFFENSES based on the December 2, 2022, execution of a search warrant at one of the residences, as well as based on items recovered from MOORE during his arrest.[1]  The facts of each of the offenses – as well as evidence linking the offenses to MOORE – are described below.

---

[1] On December 2, 2022, the FBI executed a residential search warrant at ■■ 21st Street NE, Apartment ■■, Washington, D.C.  E.C., a former romantic partner of MOORE, was present at the residence during the execution of the warrant and directed agents to several trash bags containing MOORE's property.  As detailed below, among the items recovered were the jacket and jeans the suspect is depicted wearing during the October 26, 2022, armed robbery of McDonald's, and the "HOKA" sneakers the suspect is depicted wearing during the October 26, 2022, armed robbery of McDonald's; the November 9, 2022, armed robbery of 7-Eleven; and the November 22, 2022, armed robbery of the U.S. Post Office.

### *October 21, 2022, Armed Robbery of 7-Eleven, 637 Pennsylvania Avenue SE*

10.    On Friday, October 21, 2022, at approximately 9:21 p.m., an armed robbery of the 7-Eleven convenience store located at 637 Pennsylvania Avenue SE, Washington, D.C., occurred. Metropolitan Police Department officers responded and located W-1 and W-2, who are both employees of the store.  W-1 stated that they saw the suspect pacing outside the store for several minutes before the robbery.  When the suspect entered the store, W-1 saw the suspect point a gun at them.  W-1 jumped over the counter and ran out of the store.  W-1 described the suspect as a Black male in his 30s, light complexion, 5'5" to 5'6" in height, wearing black pants, a black shirt, a black hoodie, and a blue/gray/white ski mask, and carrying a black cross-body bag.  W-1 said the suspect was armed with a black handgun that had an odd-shaped barrel and could have been a BB gun.  W-2 also stated that they noticed the suspect pacing outside before the robbery.  W-2 said the suspect told them to open the register at gunpoint and put money into a large gray bag. W-2 emptied two registers into the bag, and the suspect demanded Newport cigarettes.  W-2 told the suspect there were no more Newports.  The suspect then fled eastbound on Pennsylvania Avenue SE.  W-2 estimated that the suspect obtained approximately $200 in United States currency.  W-2 described the suspect as a Black male in his 30s, light complexion, the same height as W-1 (i.e., 5'6"), skinny build, wearing all black clothing and a multi-color ski mask, and carrying a large gray bag.

11.    7-Eleven is a business engaged in and affecting interstate commerce.

12.    As depicted in the still images included below, video surveillance from inside the 7-Eleven captures the suspect carrying what appears to be a black and gray duffle bag.  The suspect is also depicted wearing a blue and white gaiter-style face mask, a dark baseball cap, a black jacket

or hooded shirt, and black shoes with white soles and three white stripes on the sides.

 

*Surveillance of 10/21 7-Eleven Robbery Depicting Gaiter, Sneakers, and Duffle Bag*

13.     Incident to MOORE's November 28, 2022, arrest, law enforcement recovered sneakers with three white stripes and a blue and white gaiter, consistent with those observed in the surveillance footage, which are depicted below:

 

*Sneakers and Gaiter Recovered During MOORE's November 28 Arrest*

<u>*October 26, 2022, Armed Robbery of McDonald's, 1539 Pennsylvania Avenue SE*</u>

14.     On Wednesday, October 26, 2022, at approximately 10:10 a.m., an armed robbery of the McDonald's restaurant located at 1539 Pennsylvania Avenue SE, Washington, D.C.,

occurred.  The suspect entered the restaurant wearing a face mask, hat, hoodie, and red glove.  The suspect then loitered inside for several minutes.  W-3, an employee of the restaurant, went into the men's bathroom to clean it.  While W-3 was inside, the suspect entered the bathroom.  The suspect pointed a gun at W-3 and began yelling "money" several times.  W-3 had to pull out their phone to translate what else the suspect was saying, and the suspect grabbed it out of their hand.  The suspect then grabbed the back of W-3 with his gloved hand and, with a gun in his other hand, walked W-3 out of the bathroom and to a nearby door that leads to the area where the cash registers are located.  The suspect ordered W-3 to open the door, and W-3 complied.  The suspect demanded that money be put into his black and gray duffle bag, and W-4 put the money from the register (approximately $500 in United States currency) into the bag.  At approximately 10:31 a.m., the suspect took the bag and walked out of the restaurant while tucking the gun into his waistband.

15.     On October 26, 2022, W-5, a concerned citizen, called 911 and reported that they had seen the suspect running in the 1300 block of K Street SE at approximately 1:15 p.m.  W-5 did not witness the robbery but had received a crime alert about it.  W-5 said that the suspect was wearing a gray and black jacket, a dark gray or blue shirt, black or gray pants (which they described as "whitewashed"), a blue surgical mask, and a light afro hairstyle.  W-5 observed the suspect go into 1317 K Street SE.  W-5 later called 911 and reported seeing the same individual on November 6 and 13, 2022.  MPD detectives reviewed surveillance footage from the property and determined that the person W-5 observed was not the suspect.  W-5 was informed that the person they had observed was not the suspect and was provided a still photograph of the suspect.

16.     On October 28, 2022, W-3's phone was "pinging" in the area of 12th and K Streets SE.  MPD detectives investigated and learned that a cleaning person had found the phone on

October 27, 2022, between 1:00 p.m. and 2:00 p.m., in a stairwell of the Hopkins Apartments,

1000 12th Street SE, Washington, DC.  The cleaning person turned the phone in to the rental office,

from which it was recovered by MPD.

17.     McDonald's is a business engaged in and affecting interstate commerce.

18.     As depicted in the still images included below, video surveillance depicts the

suspect.  The suspect is depicted wearing a blue and white gaiter-style face mask; a baseball cap;

a dark hooded jacket with a white zipper, a white zippered pocket on the right chest, an oval

emblem on the left chest, and white sides; a red glove; gray and black jeans; black sneakers with

white soles and "HOKA" in white lettering on the sides.  The suspect is also depicted carrying a

black and gray duffle bag.

 

***Surveillance of 10/26***      ***Shoes Seized During 12/2***
***McDonald's Robbery***      ***Search Warrant Execution***



***Surveillance of 10/26
McDonald's Robbery***



***Jacket Seized During 12/2
Search Warrant Execution***



***Surveillance from 10/26
McDonald's Robbery***



***Jeans Seized During
12/2 Search Warrant Execution***

8

19.     The jacket, jeans, and shoes were recovered during the execution of a search warrant at ██ 21st Street NE, Apartment ██, on December 2, 2022.  E.C., who has been in a romantic relationship with MOORE, and whose electronic benefits card MOORE had in his possession when he was arrested on November 28, 2022, resides at that address.

### *November 9, 2022, Armed Robbery of 7-Eleven, 1501 Independence Avenue SE*

20.     On Wednesday, November 9, 2022, at approximately 5:33 a.m., an armed robbery of the 7-Eleven convenience store located at 1501 Independence Avenue SE, Washington, D.C., occurred.  The suspect entered the 7-Eleven store and walked around for several minutes.  The suspect then walked behind the cash register area and pointed a black handgun at W-6, an employee.  The suspect threw a blue plastic bag on the ground and said, "give me all the money."  W-6 opened one cash register, put an unknown amount of United States currency into the bag, and attempted to close the cash register to avoid giving larger bills to the suspect.  The suspect became upset and said, "motherfucker, don't play with me and give me all the money."  W-6 proceeded to open both registers and fill the bag with the remainder of the currency.  The suspect then exited the store and fled on foot southbound on 15th Street SE towards Massachusetts Avenue SE.

21.     7-Eleven is a business engaged in and affecting interstate commerce.

22.     As depicted in the still images included below, video surveillance from inside the store shows the suspect wearing a blue and white gaiter-style face mask; a baseball cap with a sticker on the visor; a dark hooded sweatshirt or jacket with an embroidered logo on the left chest and grey accents around the pockets; dark pants; and black sneakers with white soles and "HOKA" in white lettering on the sides.

  

***Surveillance from 11/9 7-Eleven Robbery***          ***Shoes Seized During 12/2 Search Warrant Execution***

  

***Hat Seized During 12/2 Search Warrant Execution***   ***Surveillance from 11/9 7-Eleven Robbery***   ***Jacket Seized During 12/2 Search Warrant Execution***

 

***Surveillance from 11/9 7-Eleven Robbery***          ***Gaiter from MOORES's 11/28 Arrest***

23.     As discussed above, the gaiter was recovered incident to MOORE's November 28, 2022, arrest.  The jacket, hat, and shoes were seized during the execution of a search warrant at E.C.'s residence on December 2, 2022.

### *November 22, 2022, Armed Robbery of U.S. Post Office, 600 Pennsylvania Avenue SE*

24.     On November 22, 2022, at approximately 2:42 p.m., an armed robbery of the U.S. Post Office located at 600 Pennsylvania Avenue SE, Washington, D.C., occurred.  The suspect walked up to teller counter, crouched down, and pulled a black handgun from his bag.  W-7 and W-8, who are tellers, ran towards the back door while the suspect followed, pointing the handgun at them.  The suspect turned his attention to W-9, an employee in the breakroom, pointing his gun at W-9 and demanding money.  W-9 went to one of the cash registers and opened the drawer.  The suspect became impatient and grabbed the cash drawer, emptying approximately $200 in United States currency into his bag on the floor.  In the parking lot behind the post office, W-8 encountered W-10, a letter carrier, and told them the post office had been robbed.  W-8 pointed to the suspect, who was running towards C Street SE.

25.     W-8 and W-10 followed the suspect, and W-10 took the below picture of the suspect with their phone as the suspect mounted a bicycle in an alley off of C Street SE.  The

bicycle—which is green with chrome accents and a tan leather seat—appears to be identical to the bicycle with which MOORE was arrested on November 28, 2022.



*Photo Taken by W-10 on 11/22*          *Bicycle Seized from MOORE Incident to 11/28 Arrest*

26.     As depicted in the still image included below, video surveillance from inside the U.S. Post Office depicts the suspect wearing khaki pants; a black jacket; a winter hat; and black sneakers with white soles and "HOKA" in white lettering on the sides.  The video also depicts the suspect carrying a black and gray duffle bag.



*Surveillance from 11/22*          *Pants Seized from MOORE*          *Shoes Seized During 12/2*
*U.S. Post Office Robbery*          *Incident to 11/28 Arrest*          *Search Warrant Execution*

12

27.     On November 22, 2022, MPD officers stopped an individual in the 200 block of I Street SE in response to a lookout.  It was determined that the individual was not the suspect.

28.     As an employee of the U.S. Postal Service, W-9 has lawful charge, control, and custody of mail matter, money, and other property of the United States.  The money the suspect stole from the U.S. Post Office during the robbery was the property of the United States.

29.     While processing the scene of the November 22, 2022, postal armed robbery, United States Postal Inspectors collected six latent prints from the register till and sent them to their lab for analysis.  On November 30, 2022, a latent print examiner at the U.S. Postal Inspection Lab analyzed the latent prints and determined a latent print on a cash drawer insert divider from the register till was a positive match to MOORE.  Four latent fingerprints from the bottom of the cash drawer insert were determined not to be the fingerprints of MOORE, and the remaining latent fingerprint yielded inconclusive results.  The latent fingerprints were searched in the FBI's automated database but did not result in any additional identifications.

### *November 28, 2022, Armed Robbery of CVS, 2400 Richmond Highway, Arlington, VA*

30.     On November 28, 2022, at approximately 7:40 a.m., an armed robbery of the CVS store located at 2400 Richmond Highway in Arlington, Virginia, occurred.  The suspect fled with United States currency and "bait money" that contained a GPS tracker.  The suspect was arrested shortly after trying to flee on a green bicycle, identical in appearance to the bicycle on which the suspect fled the November 22, 2022, armed robbery of the U.S. Post Office.

31.     The suspect was identified as Mark Thomas MOORE, date of birth ██/██/1991.  At the time of his arrest, MOORE possessed a blue bag containing approximately $356 in United

13

States currency and the "bait money" from CVS containing the GPS tracker.  MOORE had a large black handgun, which was later determined to be a BB gun, on his person.  MOORE was still wearing the clothes he had been wearing during the armed robbery of the CVS, and he had additional clothes in his bag.  MOORE was wearing khaki pants, identical in appearance to those that the suspect is depicted wearing during the November 22, 2022, armed robbery of the U.S. Post Office, and black sneakers with white soles and three white stripes on the side, identical in appearance to those the suspect is depicted wearing during the October 21, 2022, armed robbery of 7-Eleven.  MOORE was also in possession of a blue and white gaiter-style face mask.

32.    Information regarding MOORE's arrest was provided to other members of law enforcement, including Your Affiant and MPD detectives.  Your Affiant and other members of law enforcement have reviewed the evidence and property MOORE had on his person at the time of his arrest, and, for the reasons detailed in this affidavit, MOORE is believed to be the suspect in the four armed robberies in Washington, D.C., that are described above.

### *Similarities of Offenses*

33.    The above-described offenses involved similarities in specific items of clothing worn by the suspect, as well as similar items used during the offenses, which link MOORE to the offenses described above.

34.    As depicted in the still images included below, surveillance footage from the October 21, 2022, armed robbery of 7-Eleven; the October 26, 2022, armed robbery of McDonald's; the November 9, 2022, armed robbery of 7-Eleven; and the November 22, 2022, armed robbery of the U.S. Post Office depict the suspect using a long black handgun consistent in appearance with the BB gun recovered from MOORE incident to his November 28, 2022, arrest.

14



***BB Gun Recovered from MOORE Incident to 11/28 Arrest***



| ***10/21*** | ***10/26*** | ***11/9*** | ***11/22*** |
|:---:|:---:|:---:|:---:|
| ***7-Eleven Robbery*** | ***McDonald's Robbery*** | ***7-Eleven Robbery*** | ***U.S. Post Office Robbery*** |

35.     As depicted in the still images included below, surveillance footage from the October 26, 2022, armed robbery of McDonald's; the November 9, 2022, armed robbery of 7-Eleven; and the November 22, 2022, armed robbery of the U.S. Post Office depict the suspect wearing the same black sneakers with white soles and "HOKA" printed in white lettering on the sides.  As referenced above, these appear to be identical to MOORE's sneakers, which were seized during the execution of a search warrant at E.C.'s residence on December 2, 2022.

15



| *10/26 McDonald's Robbery* | *11/9 7-Eleven Robbery* | *11/22 U.S. Post Office Robbery* | *Shoes Seized During 12/2 Search Warrant Execution* |

36.     As depicted in the still images included below, surveillance footage from the October 21, 2022, armed robbery of 7-Eleven; the October 26, 2022, armed robbery of McDonald's; and the November 22, 2022, armed robbery of the U.S. Post Office depict the suspect using what appears to be an identical black and gray duffle bag to collect robbery proceeds.



| *10/21 7-Eleven Robbery* | *10/26 McDonald's Robbery* | *11/22 U.S. Post Office Robbery* |

37.     The four above-described robberies are linked by similarities in specific items of clothing or items used during the offenses.  The suspect used a large black handgun in each of the four robberies, which appears identical to the BB gun recovered from MOORE incident to his November 28, 2022, arrest.  The suspect wore the same "HOKA" sneakers during the October 26, 2022, armed robbery of McDonald's; the November 9, 2022, armed robbery of 7-Eleven; and the

16

November 22, 2022, armed robbery of the U.S. Post Office. MOORE owns identical sneakers, which were seized during the execution of a search warrant from E.C.'s residence on December 2, 2022. The suspect used the same black and grey duffle bags during the October 21, 2022, armed robbery of 7-Eleven; the October 26, 2022, armed robbery of McDonald's; and the November 22, 2022, armed robbery of the U.S. Post Office.

### ***Seizure of the Device***

38.      During the search of E.C.'s residence on December 2, 2022, Agents also seized the Device, which was recovered from one of the bags containing MOORE's property, including the articles of clothing depicted in this affidavit.

39.      When speaking with law enforcement officers on scene, E.C. stated that the Device did not belong to her. E.C. further stated that she believed MOORE's phone had a cracked screen. The Device recovered from the bag with MOORE's property did not have a cracked screen; however, given that the Device was located with MOORE's personal property and E.C. disclaimed any ownership of the Device, Your Affiant believes that the Device is associated with MOORE. Further, MOORE appears to have been in E.C.'s residence the day before his arrest[2] and did not have a phone in his possession at the time of his arrest.

---

[2] On the evening of November 27, 2022, members of the Metropolitan Police Department responded to E.C.'s residence in response to a domestic dispute call. E.C. and MOORE have been in a romantic relationship. Your Affiant reviewed body-worn camera footage related to the November 27 incident. E.C. advised officers that she wanted MOORE—who was not present when officers responded—out of her residence. E.C. explained that she had allowed MOORE to stay at her residence for the past two months even though she had a protection order against him. E.C. provided officers with a name and picture that showed the individual she was describing is the same Mark MOORE that was arrested on November 28, 2022 (as described above). E.C. mentioned that MOORE had taken the keys to her residence when he left. On November 28, 2022, when MOORE was arrested, he was found to be in possession of a set of keys that appear to belong to a residence, as well as E.C.'s electronic benefits card.

40.     The Device is currently in the lawful possession of the FBI and stored at the FBI's

Washington Field Office, 601 Fourth Street NW, Washington, D.C. 20535.

## **TECHNICAL TERMS**

41.     Based on my training and experience, and information acquired from other law

enforcement officials with technical expertise, I know the terms described below have the

following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their

respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high

speed data processing device performing logical or storage functions, and includes any data storage

facility or communications facility directly related to or operating in conjunction with such device.

*See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information

processing using a binary system to represent information.  Computers include, but are not limited

to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing

units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information

storage device in which information is preserved in binary form and includes electrical, optical,

and magnetic digital storage devices.  Examples of digital storage media include, but are not

limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards,

and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive,

capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic,

18

or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

    b.  "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data

security devices.   Data security hardware may include encryption devices, chips, and circuit boards.   Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.   Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

       f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.   Computer software is stored in electronic, magnetic, or other digital form.   It commonly includes programs to run operating systems, applications, and utilities.

       g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.   An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).   Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

       h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

       i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.   ISPs provide a range of functions for their customers,

including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of

an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

      m.    "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

      n.    "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

      i.    When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file

23

into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

       ii.    Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

      o.    "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

      p.    "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An

authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.   "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

42.   Based on my training, experience, and research, and from consulting the manufacturer's product technical specifications available online at https://www.tinno.us/_files/ugd/b052bb_db82358e69874a37bdb359153c24ec9c.pdf, I know that the Device is a smartphone running the Android operating system.  In addition to functioning as a cellular telephone that can send and receive telephone calls and text (i.e., "Short Message Service" or "SMS") messages, the Device has capabilities that allow it to serve as a digital camera, portable media player, GPS navigation device, and email communications device.  The Device has a web browser, allows users to send "advanced messages" by which large files can be sent, and allows users to access  and post to social media, such as Facebook and YouTube, via applications or "apps."  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

43.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Device, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Device for at least the following reasons:

a.     Based on my training and experience, I know that people who commit crimes in Washington, D.C., often use their smartphones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity.  For example, this may include location information (e.g., GPS data), app usage information (e.g., Internet search inquiries), and images or video recordings relevant to the criminal activity.  Furthermore, I know from my training and experience that call logs, text messages, emails, and any app enabling communication with others often include communications that shed light on the cell phone user's location and activity during a particular time period.

b.     Your Affiant knows that people who possess firearms like to take pictures of themselves with firearms to prove ownership or possession of a particular firearm to their friends. They will use a camera, smartphone with a camera, tablets with a camera, and/or personal computers to photograph, store, and transmit photographs of firearms or themselves holding the firearm and other criminal activity that they may be involved in. These pictures or videos are excellent evidence of illegal gun possession. Moreover, smartphones can contain communications

26

relating to the acquisition of firearms by those who cannot possess firearms legally, including the transmission of photographs of firearms available for purchase, with accompanying price information.

        c.    Smartphones used by possessors of illegal firearms contain valuable information and evidence relating to their possession of firearms. Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, GPS data, and any other stored electronic data. Such information can allow law enforcement to, among other things: (i) identify communications relating to the possession of firearms and communications evidencing the firearms relationship between parties; (ii) provide contact information regarding potential suppliers, customers, and distributors of firearms; (iii) identify meeting locations for the potential commencement of firearms transactions or acquisition of firearms; and (iv) identify photographs of firearms and firearms paraphernalia (such as magazines and ammunition).

        d.    Individuals who engage in criminal activity, including robberies such as the SUBJECT OFFENSES, use smartphones to access websites to facilitate illegal activity and to communicate with co-conspirators and others about their criminal activity online; to store on digital devices documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators and others; email correspondence; text or other messages; contact information of co-conspirators and others, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; and documentation of, or an accounting of, illegal proceeds.

e.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

f.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smartphone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smartphone, or other digital device habits.

28

44.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device is, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal

29

information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smartphone, or other digital device was in use.  Computer, smartphone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team

and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

### METHODS TO BE USED TO SEARCH DIGITAL DEVICES

45.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

        a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being

searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.　　Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.　　Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.　　Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can

easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.   Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smartphones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

> e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms

of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smartphones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smartphones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

      f.     Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

46.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.     The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.

35

Any search techniques or protocols used in searching the contents of the Device will be specifically chosen to identify the specific items to be seized under this warrant.

### AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

47.    Because the device is in the custody of the FBI and forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

### CONCLUSION

48.    Your Affiant respectfully submits that this affidavit supports probable cause for a warrant to search the Device described in Attachment A and to seize the items described in Attachment B.  Based on the foregoing, Your Affiant respectfully requests that the Court issue the proposed search warrant pursuant to Federal Rule of Criminal Procedure 41.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Respectfully submitted,

Kevin Moore
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) by telephone on December 16, 2022

HONORABLE ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE